524-0785 Cline v. Marion Rehabilitation & Nursing Center Rule 191a Attached Papers Requirement Under the Attached Papers Requirement, if a defendant files a Motion to Dismiss based on a supporting affidavit, and that affidavit relies on any documents, the offendant must attach those documents to the affidavit and the defendant must submit them to the trial court for review. This rule is strictly followed and failure to comply with the rule is fatal. We know that because the Illinois Supreme Court said so in the Rabideau decision that we cited in our briefs. The Attached Papers Requirement prevents courts from dismissing cases based on evidence that the trial court has never seen and that the opposing party has had no chance to see or to adequately contest. These cases involve the precise type of violation that the Attached Papers Requirement is designed to prevent. Defendants filed Motions to Dismiss based on the supporting affidavits of Kelly Kelly, the CEO of Defendant's Management Company. Ms. Kelly relied on punch data that she referenced all throughout her affidavit, but Ms. Kelly did not attach the punch data to her affidavit. And defendants never submitted the punch data to the trial court for review. Nevertheless, the trial court drew conclusions about the contents of punch data, conclusions that were not even supported by Ms. Kelly's statements about the punch data. The trial court then dismissed these cases based on its assumptions about evidence that it had never seen. So that decision conflicted with Rule 191A, it conflicted with Rabideau, and it requires reversal. Now, the Attached Papers Requirement is not the only requirement of Rule 191A that the trial court failed to apply. Mr. Frohley, is there some burden on the defendant or the plaintiff, I should say the complaining party, to make sure that the papers are submitted under the rule? I'm sorry, Your Honor, some burden on us to make sure papers are submitted under the rule? Yes. If you see that the correct papers are not attached to the affidavit, wouldn't you file a motion or take a deposition or do something to make sure that the motion to dismiss isn't allowed? So, Your Honor, there's multiple procedures for contesting a motion to dismiss that involves an attached papers violation. You know, one of the common procedures is just exactly what we did in this case, which is point out in our response brief that the initial motion and the initial affidavit did not comply with Rule 191A. I know, but why didn't you take a deposition? Well, Your Honor, we actually attempted to. I saw the email. Yes, Your Honor. There's two pieces to this. So, initially, this case had been, we'd been trying to proceed to discovery. The Mosby decision came out and defendants asked for, you know, a stay of the case pending the supplemental motion to dismiss that they would be filing. We opposed that, and we even filed a motion to compel the discovery that we were seeking, which included ESI discovery, which theoretically should have included the punch data and the hand geometry scans at issue in this case. The trial court initially sided with us and granted our motion to compel, but later, after an additional request by defendant, decided to stay discovery pending outcome of the supplemental motion to dismiss. So, this was argued multiple times in front of the trial court. Ultimately, the trial court just said, we're going to freeze discovery. So, at that point, our hands were a little bit tied because the court had ruled against us. We did go ahead and ask defendant if they'd be willing to come to the court with us and try to convince the court to change its mind again about staying discovery. We sent two emails. We, you know, were told they'd get back to us. They never did. And we'd already gotten an extension for the deadline to file our response. So, we just had to file our response and contest the motion to dismiss as deficient on its face. But, Your Honor, I think that's a little bit neither here nor there because that is the procedure that's been followed in other cases, such as the Beltran case. So, it's certainly a procedure that was available to us to contest the motion as deficient on its face under Rule 191A. Thank you. You're welcome, Your Honor. Now, Your Honors, as I was saying, beyond the attached papers requirement, Rule 191A also includes a particularity requirement. This requirement says that defendants filing motions to dismiss based on supporting affidavits must state the facts that justify each of their defenses with particularity. This means they must state those facts with a high degree of specificity so they are not leaving doubt in the trial court's mind as to whether dismissal is warranted. Ms. Kelly's affidavit failed this requirement. To obtain dismissal in this case under the health care exemption, defendants had to show that they used plaintiff's biometric data, the biometric data at issue in the complaint, which was hand geometry scans for health care payments or operations as those terms are defined by HIPAA. Now, what Ms. Kelly actually said is that defendants used, quote, punch data for health care payments and operations as those terms are defined by HIPAA. So, Ms. Kelly's affidavit could only justify dismissal if punch data is, or at least includes, hand geometry scans, the biometric data at issue in this suit. But Ms. Kelly's definition of punch data indicates that punch data is not and does not include hand geometry scans. Ms. Kelly never even uses the phrase hand geometry scan anywhere in her affidavit, nor does she use an umbrella phrase like the biometric data at issue in the complaint. Instead, she talks about punch data from the, quote, time clock at issue in the complaint. And she describes that data as data that shows the actual hours worked by employees. She says that you can look at the punch data and learn whether a particular employee was working on a particular date at a particular time. Now, your honors, you wouldn't be able to tell that information by looking at a scan of an employee's hand geometry. So, Ms. Kelly's affidavit is too vague as to what punch data consists of. It's too vague as to whether it includes hand geometry scans to satisfy the particularity requirement. Certainly, it cannot justify dismissal of this case, which regards hand geometry scans, under HIPAA's health care exemption. Now, your honors, before I move on to the health care exemption more generally, I want to address some of the primary counter arguments defendant has made in opposition to our Rule 191A arguments. So, defendant says that Ms. Kelly was not subject to the attached papers requirement because she did not rely on the punch data within the meaning of Rule 191A. According to defendant, affiants only rely on documents that they review at the specific time that they are writing or preparing their affidavit. So, your honors, there's no authority for that proposition. The Beltran decision that we cited in our briefs shows that if an affiant makes reference to a document in order to support the affiant's arguments, that's the same thing as relying on the document under Rule 191A. In fact, Beltran specifically held that an affiant violated the attached papers requirement because the affiant made reference to documents that were not attached to her affidavit. Now, it's not just our authority that shows that referencing documents as support is the same as relying on them under Rule 191A. Defendant's authority shows the same thing. The Avdik decision that was cited in defendant's briefs says that an affidavit complies with Rule 191A because it does not refer to any extraneous documents that are not attached to that affidavit. So, we have multiple Illinois Appellate Court decisions cited by both sides that show that referring to a document is the same thing as relying on it under Rule 191A, which means that the affiant is subject to the attached papers requirement and must attach the referred to documents to the affidavit. I'd further point out, Your Honors, that the plain text dictionary definitions of the word rely or the term rely on that the parties cited or used in their briefs show that to reference a document is the same as to rely on it so long as the document is required or needed as support for the affidavit's contentions. Now, in this case, Ms. Kelly's affidavit certainly needed the punch data to have certain contents to make her contentions relevant to this case. As I said before, the punch data cannot justify application of the health care exemption to this case unless it is the same as the biometric data at issue in the complaint. Your Honor, defendant has also argued that Ms. Kelly's not subject to the attached papers requirement because she testified from personal knowledge and showed that she is competent to testify at trial. These are references to two of Rule 191A's five requirements, the competence and personal knowledge requirements. This argument is not consistent with Illinois Supreme Court authority. In the Rabideau decision, the Illinois Supreme Court specifically held that even if an affiant is competent to testify at trial, they still must comply with the attached papers requirement. Now, there was a similar decision by the Illinois Appellate Court in the Doe by Doe versus Coe decision that we cited in our briefs. In that decision, the affiants professed personal knowledge as to the contents of the documents that they quoted from but did not attach to their affidavits. The Illinois Appellate Court said it did not matter that the affiants professed personal knowledge. It did not matter what the affiants knew that was separate and apart from the documents that they quoted in their affidavits. The court said that because those affidavits quoted from documents relied on documents under Rule 191A, they had to attach those documents to their affidavits to comply with Rule 191A. I'd further point out, Your Honors, that the plain text of Rule 191A shows that just complying with two of its requirements, personal knowledge and competence, does not excuse noncompliance with the remainder of Rule 191A's requirements. Rule 191A includes an inclusive list, five items, five requirements that must be satisfied with an and at the end of the list. Plain text interpretation principles tell us this means that you must comply with all five requirements in order to satisfy Rule 191A. I'd also point out that these requirements are absolute right-line rules, as has been recognized not only in Robido, which asks for strict compliance of Rule 191A, but also in Doe and Beltran and other appellate decisions and Selby that have described Rule 191A's requirements as rigid and strictly enforced. Mr. Farley, I'd like to ask you about the procedural posture of this case. This was a motion to dismiss under 2-619. Is that correct? That's correct, Your Honor. And so the affidavit was submitted to attack the legal sufficiency of the complaint. Do you agree with that? Or was the affidavit submitted to show an affirmative matter that defeats the claim? Your Honor, this was trying to show affirmative matter that defeats the claim. We obviously don't agree that it contains affirmative matter that defeats the claim, but that is our understanding of defendant's argument in this case. Well, is that the proper method for submission of an affidavit, or should it have been a motion for summary judgment? Well, Your Honor, a section 2-619A-9 motion to dismiss that is based on a supporting affidavit, this is similar to a summary judgment motion. And as the appellate court has pointed out, a genuine issue of material fact will prevent dismissal of a section 2-619A-9 motion to dismiss. Now, I do think this type of motion would have been better suited for a summary judgment motion, you know, certainly in which we had a chance to depose Ms. Kelly and take discovery on the punch data and hand geometry scans. Section 2-619A-9 is, and this is not my words, this is the appellate court's words, this is a procedure that's for easily proven facts, easily proven facts. You know, certainly the facts in this case are not easily proven, they're very complex and, you know, so our position is that this would be better suited for a summary judgment motion, and that they haven't met their burden under section 2-619A-9 of demonstrating any easily proven facts, much less facts that justify dismissal. So, when a 2-619 motion is filed, that admits the legal sufficiency of the complaint, doesn't it? Yes, Your Honor. So, now they're filing an affidavit without any documentation, according to you, that they're claiming proves an affirmative matter that somehow defeats all of the allegations of your complaint. That's their claim, Your Honor. Correct. Is that the procedural posture of the case? Yes, Your Honor. That's the procedural posture of this case. Okay. Thank you. So, Your Honor, defendant also cites two cases, the Beattie decision and the Hanley decision, to support defendant's claim that the attached papers requirement is a, quote, technical requirement that can be disregarded in the circumstances of this case. I'd like to point out that the Beattie decision is no longer good law because it preceded the Rabideau decision in which the Supreme Court explicitly states that the attached papers requirement is not a technical requirement that can be disregarded. As for the Hanley decision, it just seems to be an error. It did not mention or account for Rabideau's change in law. It is an appellate court decision that cannot override the Supreme Court decision in Rabideau, and it's cited to pre-Rabideau precedent for its belief that Rule 191A's attached papers requirement is really a technical requirement. Beyond the fact that binding Supreme Court authority holds that the attached papers requirement is not a technical requirement, there's also a long line of appellate court cases, which we cited in our briefs, holding that consistent with Rabideau, the attached papers requirement is not technical and cannot be disregarded. Mr. Frawley, before you run out of time, could you reach the second issue? Yes, happily, Your Honor. Thank you for bringing that to my attention. So, Your Honor, the trial court, as the court knows, the trial court dismissed this case under BIPA's health care exemption. To qualify for that exemption, defendant had to show that it used plaintiff's data for health care operations or payment, as those terms are defined by HIPAA. Now, even if we were to assume that punch data is the same thing as hand geometry scans, which the court should not do, defendant still did not meet its burden of showing that application of the health care exemption is proper in this case. I'll break this argument out in two parts, talking about operations. Let me just ask you, do you agree that under the Biometric Privacy Act, that there would be an exception for health care payments or operations as defined by HIPAA? Yes, Your Honor, we don't contest the Mosby decision and that was the holding of the Mosby decision. Okay. So, Your Honor, I'll break this argument out into two parts. I'd like to start with health care operations and then talk about health care payments. To qualify as a health care operation under HIPAA, an activity must be related to covered functions. This means it must be the sort of activity, the performance of which makes the entity a health care provider. We know from HIPAA regulations and dictionary definitions that what makes an entity a health care provider is the provision of health care to individuals. Now, none of the activities that defendants claim as health care operational activities relate directly to the provision of health care to any particular individual. Instead, they relate to defendants' general administrative, business, and compliance activities. This means they are not related to covered functions as HIPAA defines that term, which means that they cannot justify application of the health care exemption in this case. Now, there's a similar problem with defendants' argument regarding health care payments. Health care payment activities are reimbursement activities that relate to the individual to whom health care is provided. That's 45 CFR 164501. None of defendants' proposed payment activities relate to any particular health care reimbursement for any particular individual. That means that they do not qualify as payment activities, and they cannot justify application of HIPAA's health care exemption. I say I have about 40 seconds left. I'm happy to answer any questions at that time. Otherwise, I'll take up my argument again on rebuttal. Thank you, counsel. Justice Cates or Justice Schoeller, do you have any questions at this time? No, thank you. Let me just look for a minute. What is the effect of the labor management benefit? Well, Your Honor, I don't think that there is an effect of the labor management benefit that is relevant to this case. How is that term used to avoid your lawsuit? Well, Your Honor, I don't think that it is used in a way that would avoid our lawsuit. I think that defendant is trying to argue when defendant uses that phrase labor management benefit. What I understand their argument to be is they're trying to define the data at issue in the complaint as the same thing as the punch data. And they're saying there's a labor management benefit from punch data. And because we use the phrase labor management data benefit in our complaint, they're saying these are the same types of data. I just say prima facie, that's not a compelling argument. You can get a labor management benefit from multiple forms of data, and they haven't shown that punch data is the same thing as the hand geometry scans. Why did you use it in your complaint? You alleged that the defendant received a labor management benefit from the use of the hand scan data. Yes, Your Honor, but the hand scan data that we're referring to is hand geometry scans, and the labor management benefit is identity verification. So it was just a descriptive phrase that we used in the background sections of our complaints. It wasn't meant to invoke any particular legal theory. Okay, thank you. Thank you. Thank you, counsel. Obviously, you're going to have your rebuttal time. I know, Ms. Mason, since we didn't get the clock started, I think Mr. Frowley had a couple extra minutes. So if you go a little over, I'll allow that. So with that, go ahead and proceed. Thank you and good morning. May it please the Court. My name is Jody Mason, and I represent the Defendants Appalese, Marion Rehabilitation and Nursing Center, LLC, and Heron Rehabilitation and Nursing Center, LLC. The issue before the Court is whether plaintiffs' BIPA claims were properly dismissed pursuant to BIPA's health care exemption. Where the unrebutted evidence submitted by the defendants established that defendants used the data at issue for health care operations and payment, as those terms are defined under HIPAA. Consistent with the Illinois Supreme Court's decision in Mosby v. Ingalls Memorial Hospital, the answer to that question is yes. Thus, this Court should affirm the decisions of the Circuit Court. Section 10 of BIPA, where the health care exemption is found, is straightforward. It exempts from BIPA's coverage information collected, used, or stored for health care treatment, payment, or operations, as those terms are defined under HIPAA. In Mosby, which, by the way, was decided on a 2619 motion to dismiss, like the motions filed here by defendants, the Illinois Supreme Court made clear that to determine the applicability of BIPA's health care exemption, courts must look to HIPAA's definitions of the terms treatment, payment, and operations and conduct an individualized assessment regarding whether the alleged data at issue was collected, used, or stored by the health care provider for one of those defined purposes. To be clear, defendants do not suggest that the Court adopt an industry-wide exemption for all health care workers in all circumstances. Rather, the Court must look to the particular facts and circumstances about how the data was used in these cases to determine whether the health care exemption applies. Defendants are Medicare and Medicaid certified nursing homes and are licensed by the Illinois Department of Public Health as skilled nursing facilities. In order to maintain their licenses, defendants are required to comply with the Illinois Nursing Home Care Act. Additionally, because defendants receive Medicare and Medicaid reimbursement from the state and federal governments, they're also subject to the Centers for Medicare and Medicaid Services regulations and other state and federal regulations. Plaintiffs Verity and Christy are certified nursing assistants, and Plaintiff Klein was the social services director. All three plaintiffs were registered health care workers with the Illinois Department of Public Health. Plaintiffs Verity and Christy, as certified nursing assistants or CNAs, they were directly involved in providing routine daily nursing care to defendants' patients. Defendant Klein, as the social services director, was responsible for several aspects of patient care, including the coordination of care with the nursing director to assess residents' readiness for hospital discharge and anticipate their care needs, to meet with patients and families about their care options, including do-not-resuscitate orders and the like. In order to comply with the Nursing Home Care Act and maintain their licenses under Illinois law, defendants are required to meet certain minimum staffing requirements to ensure that they have sufficient staff on hand at any given time to meet the health care needs of their patients. So, for example, defendants are required by law to maintain a minimum daily staffing ratio of 3.8 hours of nursing and personal care each day for a resident needing skilled care, and 2.5 hours of nursing and personal care each day for residents needing intermediate care. And Illinois law defines nursing and personal care to include the time of direct care staff, such as certified nursing assistants like Plaintiffs Verde and Christie, registered nurses, licensed practical nurses, and 30% of the time of social services directors like Plaintiff Klein. These and other facts supporting defendants' health care exemption defense, which plaintiffs made no attempt to rebut, were set out in detail in Affidavits of Kelly Kelly, which were submitted by defendants. Ms. Kelly is the Chief Executive Officer of Integrity Health Care Communities, which is the entity that manages defendants' facilities. And Ms. Kelly stated in her affidavit that her affidavit was based on her own personal knowledge as the CEO of Integrity, her 10 years working with Integrity Facilities, her 36 years working in the health care industry, and her training in Nursing Home Administration. Ms. Kelly outlined the multiple ways in which defendants used the data at issue generated from plaintiffs scanning their hands on the time clock at issue, what she refers to as the punch data, for purposes of health care operations and payment. Ms. Kelly didn't need to rely on any documents in order to provide that testimony, and she certainly didn't need to review the punch data itself in order to prepare testimony about how that data was used. Plaintiffs did not... Ms. Mason, why not? Does she hold all that information in her head? Well, because the contents of the punch data itself is not probative to any issue before the court. In order for her to testify about how that data was used, and she didn't rely on the data, right? Well, she had to have relied on the data in order to generate an opinion as to how it was used. She referenced the data, but she didn't have to review or rely upon the contents of the scans themselves in order to form that opinion. For example, Justice, I can testify or provide an affidavit that the brief we filed with the court in this matter was typed using Microsoft Word. I can provide an affidavit to the court stating how I used Microsoft Word to type the brief without attaching the source code for the software, or even the brief itself, the contents of which have no probative value to my testimony about how the software, Microsoft Word, was used. And the same is true here. There's nothing probative about the contents of the data itself, and there's no indication in the affidavits that Ms. Kelly relied on that data, whether she relied upon her personal experience to testify how it was used. Well, you're trying to use an exception to the statute, which is the health care payments or operations, right? Correct. And these are generalized comments that she makes about how it's used to track employees with the state. How does the allegations that she made pertain to an individual within the nursing home? You mean the individual patient? The individual patient who is receiving care and treatment to whom HIPAA applies. So, first of all, there's nothing in the definitions of health care operations or covered function that it involves, it says that it has to relate specifically to the health care of an individual patient. But that said, the data... There's nothing in the regulations that says that? Not in the definition of health care operations or payment. But generally, in the regulations, do you have to show that the data is used for an individual patient, as in Mosby, you were giving medication to an individual patient? So, the definition of health care operations says that it needs to relate to a covered function, which is those functions of a covered entity, the performance of which makes the entity a health plan, a health care provider, or a health care clearinghouse. And here, the health care provider, first of all, expressly includes a provider of services, which in turn expressly includes a skilled nursing facility like defendants. What the defendants did here was critical to ensuring that they could maintain their license and operate as skilled nursing facilities in the state of Illinois and provide health care to the patients that they were treating. If they weren't able to maintain their licensure under Illinois law as a skilled nursing facility, they couldn't treat patients and they couldn't provide health care at all. And it's important to note that the Federal Department of Health and Human Services, which is the entity responsible for enforcing HIPAA, has stated expressly that sufficient staffing is critical to the delivery of quality health care. And HHS says that health care providers like defendants should use methods of ensuring sufficient staffing that reflect the actual on-the-floor staff at any given time, as opposed to theoretical on-paper staff, for example, in employee schedules. The defendants use the data for those purposes. And is the staffing requirement set forth in the regulations? Yes, it is, very explicitly in the Nursing Home Care Act. And how do we know how the biometric hand scan data is transformed into compliance with that requirement? How do we know? Because Ms. Kelly testifies in her affidavit that the scans were, the data at issue, the punch data was used to ensure that one employee could not clock in for another, for example. And that's the exact same thing that plaintiffs allege in their complaint. If you look at... And in the complaint, didn't you deny that fact in your answer? I apologize, Judge. Justice, I don't have that in front of me at the moment. Yeah, I think if you checked that, you denied that. But let's go on. You also denied there was a labor management benefit in your answer to the complaint. And yet you used that in the affidavit to affirmatively state that the exemption applied. Which should we give credence to? The answer to the complaint or the affidavit of Ms. Kelly? And again, I don't have the answer in front of me at the moment. But I believe we likely denied that allegation because we deny that the data at issue was biometric as that's defined under BIPA. Because again, it falls outside the scope of BIPA in Section 10 of the health care exemption. But the data... Just generally, if the plaintiff has a complaint and you deny the allegations, and then you try to use the same language like labor management benefit in an affidavit to allege an affirmative matter under 2-619, now we have a contest of facts. Which should control? Justice, this is not a factual dispute because for purposes of a 619A9 motion, we take all of the facts in the complaint as true. And we look to see whether there is an affirmative matter outside of the allegations in the complaint that defeat plaintiff's claims. And here, that affirmative matter is set forth in detail in Ms. Kelly's affidavit, which is unrebutted. The plaintiffs made the strategic decision... Well, the plaintiffs wanted to take a deposition, but you denied that. Justice, there is a procedure set forth explicitly in Rule 191B that says if somebody believes that they need discovery, essentially, that they are unable... in order to respond to a 619 motion to dismiss, that they need to follow the procedure in 191B to request that discovery and state specifically why the affidavits they need or information they need cannot be procured and what they believe those appeants would testify to if sworn. They didn't do that. How did they do that? How did they comply with that rule if they don't have discovery or any discovery? They file a motion expressly with the court and seek the discovery that they claim that they need to respond to the motion to dismiss. And again, they chose not... And did you agree to allow discovery? They didn't file that motion. Okay, they sent you an email. That is not sufficient to comply with Illinois Supreme Court Rule 191B. Understood, understood. But under Rule 201K, I think it's 201K, maybe I'm... But in order to get along, you have to reach out to the other side first and see if there's an opportunity to conduct discovery that's already been closed by the court. Agreed? Agreed. But then if that process does not result in the plaintiff receiving what they felt that they needed in terms of discovery, again, it was incumbent upon them to file a 191B request with the court, and they did not do that. Okay, let me ask you a different question.  Under 45 CFR 160.103, 160.103, it defines health care as specific to care services or supplies related to the health of an individual, which is what I was asking before. How do you translate punch data to the care of an individual in this case? So that respectfully is not the correct definition that the Illinois Supreme Court in Mosby instructed that we should be looking to. In Mosby, the court said that we should be looking to the definitions of health care, treatment, payment, and operations in 164.501. And health care operations, all three of those words together, is a defined term of art, and it specifically sets forth what those operations are in the regulations. And those things include, for instance, accreditation, certification, licensing or credentialing activities, and Ms. Kelly's affidavit speaks to those issues about how the punch data was used for those purposes, and to prevent buddy punching, which speaks to the fraud and abuse detection and compliance programs. All of those things go to the very heart of defendants' ability to provide quality health care to all the individual patients under its care, again, as the Department of Health and Human Services recognized. That section also goes to arranging for medical review, legal services, auditing functions, including fraud and abuse detection and compliance programs, correct? That's correct. So, are you saying that MOSB stands for the proposition that 45 CFR 164.501 is, if satisfied, is an exemption to the BIPA Act? Yes, that's precisely what the Illinois Supreme Court holds in MOSB. Okay. So, if that's true, then you have to show somehow that the biometric data from a hand scan is translated into punch data. Is the definition of punch data anywhere in Ms. Kelly's affidavit? It is, Justice. And does it relate? Does that definition define how you get from a hand scan to punch data? Well, the hand scan is the punch data. It's the data generated from individuals scanning their hands on the clock is how Ms. Kelly describes the data. I understand that it's data generated from, but I want to know about the actual scan itself and the detail that's obtained from a scan of a hand, which I assume is much like a fingerprint, and how you generate the data. There must be a program of some kind that translates the biometric electronic imaging to the detail of the punch data, but we don't know what that is. But it's not necessary to know that in order to decide this issue. Why not? It's important to note that in MOSB, the Illinois Supreme Court did not find that it needed the finger scan data itself in order to decide the motion, that the data fell within the scope of the exemption on a 2619 motion like here. And I just want to point out that the plaintiffs claim that the only data that can be at issue here are the hand geometry scans themselves. That is inconsistent with the allegations in their own complaint. If you look at paragraph 11 of the Klein complaint and paragraph 12 of the Verity complaint, plaintiffs described the data as, quote, the unique biometric hand geometry scan identifiers or information derived from those identifiers. Counsel would have you ignore entirely the second part of what they allege the data at issue is. And again, that data is the very same data Ms. Kelly describes in the affidavit. And it was used, as plaintiffs allege, to ensure that one employee could not clock in for another. That use has a very specific health care operations purpose and falls within the scope of the exemption, including by ensuring defendant had sufficient staff on hand at any given time to ensure that it could meet the health care needs of its patients and to comply with Illinois staffing requirements and maintain their licenses under Illinois law. The Mosby decision dealt with dispensing medication to an individual within the nursing home, correct? It dealt with, yes, using finger scans to access medication dispensing cabinets to then access the medication to treat the patients. So it's not as though in Mosby the finger scans themselves were prescribed to the patient. The finger scans were the function used to verify identities of the individuals accessing those cabinets to make sure that unauthorized people were not accessing the medication dispensing cabinet, that there were not drug diversion issues. And it was the medicine then that was obtained, right? The Tylenol, the Vicodin, whatever it was, to treat the patient, not the finger scans themselves. And that did not prevent the Illinois Supreme Court from holding that the data fell within the scope of the exemption. But the data in Mosby was not some generalized data that was used for state compliance. Well, I believe that there were various regulations that may have related to that issue, but... But that was not the holding in Mosby. That was not the holding. The holding was on the record before the court was the use of the finger scan data used for purposes that fell within the scope of those definitions as those terms were defined under HIPAA and the court held that it was. And again, my question is, if you denied the fact that the hand scans were used so that people couldn't clock in for one another, and now you claim under this affidavit or through argument that that was the use of them, you agree we would have a conflict in your position? Well, I don't think that you need to decide that issue because for purposes of this motion, we have to assume that all of the facts in the complaint are taken as true. Okay. Okay. I see what you're saying. So, I see we're at time. I said I'd give you a couple extra minutes if you need to finish up. Oh, sure, sure. I appreciate that. Well, I have another question.  In the order that was entered in this case, it says that the defendant's motion to dismiss is granted on the grounds that the information generated from the use of defendant's time clock falls under BIPA. But the first paragraph says the court adopts the reasoning of the defendant. What are we to make of that as far as a finding? Well, I think that by doing that, the court was saying that we adopt the reasoning that the uses of the data at issue here falls within the scope of the exemption because it meets the uses set forth in the definitions of health care operations and payment under HIPAA. But we're taking, you know, there's no clarity in this court's order as far as what is being found. There's no clarity as far as an exemption. There's no clarity regarding the affidavit. So when I ask you the question, what are we to make of that? We have to take your argument for that, which is very troublesome for me looking at the order itself. Justice, you, in the context of this appeal, are able to conduct a de novo review. And so you are able to make your own determination on the record. And we believe that you should make your own determination that the data at issue here was used for reasons that fall within the scope of the exemption based on the unrebutted evidence that was set forth before the court. And again, the burden shifted to plaintiffs to provide a counter affidavit or to otherwise rebut the evidence that was provided. They chose not to do that. And while they claim that the burden didn't shift because they claim that the affidavit didn't comply with Rule 191A, we've explained in the briefs why the affidavit did comply with 191A, because Ms. Kelly did not attach or rely on any documents she did not attach. But also the cases that plaintiffs cite don't stand for that proposition. The Evergreen case that plaintiffs primarily rely on for the burden shifting argument doesn't say anything about burden shifting. So you have a case before you with an unrebutted... The Robidoux case is pretty plain. And let me just address that briefly. In Robidoux, the affiant was an expert witness who had no personal knowledge about the facts of the case. The parties in that case did not dispute that the expert witness relied upon documents that he failed to attach to the affidavit. That's not the case here. And unlike the expert witness in Robidoux, Ms. Kelly here did have personal knowledge about the facts that she testified to in terms of how the data was used. And so the Robidoux case is distinguishable on those facts here. Thank you. And for all those reasons, we ask that the court affirm the decision, the decisions of the circuit court. Thank you. Thank you, counsel. Justice Case, Justice Schiller, before we move on, any questions for Ms. Mason? Any further questions? No, thank you. I think I've asked enough of Ms. Mason. Thank you. Thank you, Ms. Mason. Mr. Farley, go right ahead with your rebuttal. I would like to start with that argument that counsel just made regarding the burden shifting framework at the section 2619 motion to dismiss stage. So counsel said that Evergreen didn't have anything to do with burden shifting. That's not true. The court explicitly talked about whether there was a burden to provide a counter affidavit under the rule that an initial affidavit, the facts in an initial affidavit are accepted as true. The court said that that rule did not apply because the rule assumes that the initial affidavit complies with the requirements of Illinois Supreme Court Rule 191A. So in that case, the initial affidavit did not comply with Rule 191A. So the court did not take the facts in the initial affidavit as true. Now, I'd like to point out that although no burden shifted to us to file a counter affidavit, in our case, it actually wouldn't matter if a burden could have shifted to us because Ms. Kelly's affidavit, the facts stated in her affidavit themselves do not justify dismissal of our complaint. The key fact that Ms. Kelly left out of her affidavit and didn't attach evidence for was what are the contents of punch data? Does it include hand geometry scans? Is it based on hand geometry scans? And if so, how are those two concepts connected? The particularity requirement and the attached papers requirement should have required defendant to state clearly what punch data is and attach evidence showing what it is. So in this case, defendant hid behind vague definitions from Ms. Kelly and hid behind the fact that it wasn't willing to submit evidence supporting Ms. Kelly's affidavit to the trial court for review or to the opposing party to look over and to contest. So, your honors, that goes to one of the statements that counsel made at the start of her argument, which was that the contents of punch data is not probative. She said Ms. Kelly did not need to review or rely on the punch data under Rule 191A because its contents are not probative. The contents of the punch data certainly is probative because those contents are the foundational fact that would make Ms. Kelly's affidavit relevant to this case. Counsel also attacked our healthcare exemption argument by saying that nothing in HIPAA regulations says operational activities must relate to the health of an individual. According to counsel, the only HIPAA regulation that we are supposed to look at, according to Mosby, is 45 CFR 501, which defines healthcare operations and healthcare payments. However, we cannot just look to that regulation to understand that regulation because 45 CFR 164501 references terms that are defined elsewhere in HIPAA. For example, it uses the phrase covered functions, the list of activities that can qualify as healthcare operations activities. That entire list is narrowed by the introductory language in 164501 that says that each of those activities only qualifies healthcare operations to the extent that they relate to covered functions, quote covered functions under HIPAA. The definition of covered functions is not contained in 164501. It's contained in 164103. That's the definition that says that in order for an activity to qualify as a healthcare operation, it must be the type of activity that makes an entity a healthcare provider. So then, to figure out what healthcare provider is and what healthcare means, you have to look to 45 CFR 160103, a third regulation from HIPAA that's relevant to this case. As Your Honor pointed out, 45 CFR 160103 defines healthcare as services related to the health of an individual. So a healthcare provider is an entity that provides healthcare services to particular individuals, to patients. So that's why multiple HIPAA regulations are relevant to the question at hand. And I point out that the Mosby decision did not say, you know, only look at 164501 and blind yourself to the rest of HIPAA regulations. It just said the court should look to HIPAA regulations to understand the healthcare exemption. And there's even language in Mosby that says that HIPAA contains carefully created definitions of operations and payments which limit the scope of the healthcare exemption. So Mosby is clearly recognizing that these are not broad, broad definitions that will include any administrative business or compliance related activity within the healthcare exemption. In fact, Mosby itself said that not all data collected from healthcare workers, that's the phrase, healthcare workers, is going to qualify under BIPA's healthcare exemption. So a lesson we have to take from Mosby is that data that's just tangentially related to healthcare, to activities that are, that might otherwise qualify as healthcare operations, is only tangentially related. That's not enough because you can make the argument that anyone who is a healthcare worker has some broad or tangential relation to healthcare treatment. Mr. Frawley, before you run out of time, I want to ask your question. What, what relief are you seeking in this case? Because, if, for example, we find that the affidavit was insufficient, I could see where the case would be reversed and remanded for further hearing and 191B. On the other hand, if we find that,  and I mean insufficient as far as the attached papers doctrine. If, on the other hand, we find that the affidavit was inadequate as a matter of law to find an exception under HIPAA, then we're saying that the affidavit was adequate or the 191 didn't apply so we can make a finding that the affidavit was inadequate as a matter of law and reverse the motion to dismiss. So you have two different potential requests for relief and I'm trying to figure out which is your request for relief here or both.  Your Honor. Well, Judge, in a perfect world, the court would hold that Ms. Kelly's affidavit was insufficient under Rule 191A, but even if it was sufficient under Rule 191A and even if punch data and hand geometry scans were the same thing, the health care exemption still wouldn't have been met. That's not a required holding in order to reverse the trial court. The court could make a decision solely under Rule 191A, reverse and remand for proceedings consistent with the court's opinion.   I know my time ran out, but you mentioned Rule 191B. Is it all right if I say a  things about 191B? It's fine with me. Go right ahead. Thank you, Your Honor. Opposing counsel discussed Rule 191B as if it is a requirement that we had to satisfy in order to invoke our argument under Rule 191A. That's not true according to the plain text of Rule 191A. Rule 191A and 191B present alternative ways to contest a section 2619 motion to dismiss that is based on a supporting affidavit. You can argue it is insufficient on their face under Rule 191A. You don't have to do anything under Rule 191B in those circumstances. That's the outcome of many of the cases we cited that only dealt with 191A and didn't do anything under Rule 191B. Finally, as to defense counsel's argument that we should have done something under Rule 191B, we could not have possibly satisfied Rule 191B. You have to name a specific hostile witness that you believe has material facts that will support your case, and you have to describe how that hostile witness will testify. This case was pre-discovery. We had moved to compel discovery, but we had not completed discovery in this case. There was no way to name the people who could describe the connections between hand geometry scans and punch data. We could not have named anyone for purposes of Rule 191B affidavit. We did not need to do anything under Rule 191B. We ask the court to reverse and remand. Thank you,  Before we let you go, Justice Cage,  Scholar, any final questions? No questions. Thank you. Counsel, thank you so much for your arguments today. We will take the matter under advisement. We will issue an order in due course.